

Stephen F. Peifer
Assistant United States Attorney

U.S. Department of Justice
S. Amanda Marshall
United States Attorney
District of Oregon
1000 SW Third Avenue, Suite 600   Main: (503) 727-1000
Portland, OR 97204-2902    Desk: (503) 727-1012
 Fax: (503) 727-1117
E-mail: Steve.Peifer@usdoj.gov

October 2, 2013

Richard J. Troberman
Attorney at Law
1501 4th Avenue, Suite 2150
Seattle, WA 98101-3225

    Re:   *United States v. Rebecca Rubin*, Case No. 6:06-CR-60011-AA
          Plea Agreement Letter

Dear Mr. Troberman:

1. **Parties/Scope**: This plea agreement is between this United States Attorney's Office for the District of Oregon (USAO) and defendant, Rebecca Rubin, and thus does not bind any other federal, state, or local prosecuting, administrative, or regulatory authority except as otherwise identified in this agreement, including Rule 20 transfers of related cases from the District of Colorado and the Eastern District of California.

2. **Charges and Penalties**:

    A. In District of Oregon case number 6:06-CR-6011-AA, defendant agrees to plead guilty to Counts 1, 7 and 8 of the Second Superseding Indictment as follows:

    **Count 1: Conspiracy to Commit Arson** in violation of Title 18, United States Code, Section 844(n). The maximum sentence is 20 years' imprisonment, a mandatory minimum of five years, a fine of $250,000, a two-to-three year period of supervised release, mandatory restitution, and a mandatory $100 fee assessment.

    **Count 7: Arson of BLM Wild Horse Facility, Burns, Oregon**, in violation of Title 18, United States Code, Section 844(f). The maximum sentence is 20 years' imprisonment, a mandatory minimum of five years, a fine of $250,000, a two-to-three year period of supervised release, mandatory restitution, and a mandatory $100 fee assessment.

    **Count 8: Attempted Arson of U.S. Forest Industries, Medford, Oregon**, in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years' imprisonment, a mandatory minimum of five years, a fine of

Richard J. Troberman
Re: U.S. v. Rebecca Rubin
October 2, 2013
Page 2

---

$250,000, a two-to-three year period of supervised release, mandatory restitution, and a mandatory $100 fee assessment.

B. In District of Colorado case number 06-CR-00191-REB, defendant agrees to a Rule 20 transfer to the District of Oregon and will plead guilty to the Indictment as follows:

**Counts 1 through 8: Arson of the Vail Ski Area, Eagle County, Colorado**, in violation of Title 18, United States Code, Section 844(i). Each of the eight counts carries a maximum sentence of 20 years' imprisonment, a mandatory minimum of five years, a fine of $250,000, a two-to-three year period of supervised release, mandatory restitution, and a mandatory $100 fee assessment.

C. In Eastern District of California case number 2:06-CR-0155-DFL, defendant agrees to a Rule 20 transfer to the District of Oregon and will plead guilty to Count 2 of the Indictment as follows:

**Count 2: Arson of BLM Wild Horse Facility, Litchfield, California**, in violation of Title 18, United States Code, Section 844(f)(1). The maximum sentence is 20 years' imprisonment, a fine of $250,000, a two-to-three year term of supervised release, mandatory restitution, and a mandatory $100 fee assessment.

3. **Factual Basis**: The factual basis for each count is attached hereto, and by this reference incorporated herein, as "Attachment 1," which defendant agrees the USAO can prove beyond a reasonable doubt.

4. **Dismissal of Remaining Counts and No Further Prosecution**: Upon sentencing, the USAO will move to dismiss with prejudice the remaining counts against defendant. Further, there will be no federal prosecution for any crimes committed by defendant currently known by the USAO as part of the instant investigation.

5. **Resolution of Sentencing Issues**: The parties agree that the court must first determine the applicable guideline range and then determine a reasonable sentence considering that range and the factors listed in 18 U.S.C. § 3553(a). Where the parties agree that sentencing factors apply, such agreement constitutes sufficient proof to satisfy the applicable evidentiary standard. The parties agree that the guideline calculations for all counts should be derived from the United States Sentencing Commission Guidelines Manual with effective date of November 1, 2000.

6. **Guideline Enhancement**: The USAO will recommend in Count 7 of case number 6:06-CR-6011-AA that the court apply the terrorism guideline enhancement in USSG § 3A1.4 because the BLM Burns arson either involved or was intended to promote a federal crime of terrorism. Consistent with the court's findings in co-defendant's cases, the USAO will

Richard J. Troberman
Re: U.S. v. Rebecca Rubin
October 2, 2013
Page 3

---

recommend 12-level upward departures for aggravating circumstances under USSG § 5K2.0 in the other counts of conviction for arson, on the ground that the guidelines do not adequately take into account defendant's intent to frighten, intimidate or coerce private individuals and corporations through her actions. Defendant reserves the right to argue against the departures and variances described in this paragraph.

7. **Role in the Offense**: The government will recommend that defendant receive a two-level downward adjustment for minor role for each count of conviction, as provided in USSG § 3B1.2(b).

8. **Acceptance of Responsibility**:

   A. **Extent of Reduction**: Subject to subsection B of this paragraph, the USAO agrees to recommend a three-level reduction for acceptance of responsibility if defendant demonstrates to the court that she fully admits and accepts responsibility under USSG § 3E1.1 for her unlawful conduct in these cases. The USAO reserves the right to change this recommendation if defendant, between plea and sentencing, commits any new violation of law, obstructs or attempts to obstruct justice as explained in USSG § 3C1.1, or acts inconsistently with acceptance of responsibility as explained in USSG § 3E1.1.

   B. **Information**: Defendant agrees to disclose to the USAO and its agents all information in her possession that is true about her personal participation in any of the offenses alleged in the indictment and any uncharged criminal conduct. Defendant agrees to participate in disclosure sessions with the USAO and its agents which shall be conducted pursuant to FRCrP 11(f), FRE 410 and USSG § 1B1.8 and as described below; *provided* that defendant shall not be required to reveal information that inculpates others, reveals their identities, or would be the functional equivalent of revealing their identities. During the disclosure session(s), defendant shall:

      (1) Disclose when, where, and how each offense occurred; this disclosure shall include such details of defendant's own individual conduct and whether defendant acted alone or in concert with others.

      (2) If an offense was done in concert with others, disclose the sum and substance of any conversations defendant had with others, *provided* that defendant shall not be required to identify others by name.

      (3) Should defendant refuse to disclose information on the grounds that it would inculpate or reveal the identity of others, the USAO may require defendant's attorney to articulate the basis for this refusal, including the

Richard J. Troberman
Re: U.S. v. Rebecca Rubin
October 2, 2013
Page 4

---

        (4)    reason(s) defendant believes such information would inculpate or identify another.

        (4)    If the USAO is persuaded that the refused information would inculpate or reveal the identity of others, the USAO and its agents will question defendant in a manner that avoids the issue or accept defendant's refusal to disclose the information.

        (5)    If the USAO is not persuaded that the refused information would inculpate or reveal the identity of others, the disclosure session will continue to another area of inquiry and the parties will attempt in good faith to find a way to allow defendant to disclose the refused information in a manner that will not inculpate or reveal the identity of others.

        (6)    Should the parties be unable to find a way to allow defendant to disclose the refused information and should the USAO deems such information to be of vital importance to the USAO, defendant and defendant's attorney will be so advised and given a reasonable amount of time to decide whether to disclose the refused information. If defendant thereafter persists in refusing to disclose the refused information, the disclosure session will terminate and the plea agreement may be declared void.

**C.** **Collateral Use**: Defendant understands that the USAO will not tolerate any further violation of federal or state law, and, should any violations become known, they will be made known to the appropriate authorities. Nothing in this agreement will preclude prosecution of defendant by those authorities for such violation. Defendant understands that nothing in this agreement will prevent the government from instituting prosecution against defendant for perjury, subornation of perjury, false statements, or false declaration if defendant commits or causes the commission of any such offense in connection with defendant's testimony.

**D.** **Sentencing Information**: Defendant understands that the USAO, pursuant to 18 U.S.C. § 3661, must provide the information given under this agreement to the presentence report writer and the sentencing judge. USSG § 1B1.8 governs the use of such information in determining defendant's applicable guideline sentencing range.

**E.** **Testimony**: It is understood by the parties of this agreement that defendant does not agree to testify at any trial, hearings or proceedings. Notwithstanding this condition of the plea agreement, the defendant acknowledges that defendant may be subpoenaed to testify at grand jury, trials and other hearings. Defendant also understands that should defendant be subpoenaed to testify, and at that time decides not to testify, and upon order of a court that defendant must testify,

Richard J. Troberman
Re: U.S. v. Rebecca Rubin
October 2, 2013
Page 5

        remains in opposition to testifying, defendant may be subject to both civil and criminal contempt proceedings.

    F.    **Best Efforts**: Any benefit defendant may receive under this agreement is solely dependent on whether defendant uses her best efforts in the disclosure sessions, the proffer agreement, and as otherwise set forth in this agreement, and is not dependent upon the identification, arrest, prosecution, or conviction of any person for any crime.

    G.    **Polygraph Examination**: Defendant further agrees to submit to a polygraph examination on the issue of truthfulness if it is deemed necessary by the United States, with an examiner selected by the USAO. If the examination results indicate deception, defendant will be afforded the opportunity to review and explain the deceptive responses. If, after consideration of defendant's responses, the USAO is convinced defendant's statement is not complete and truthful, the USAO may consider this agreement to have been breached by defendant.

    H.    **Breach of Defendant's Agreement to Disclose Information**: It is expressly understood and agreed by the parties that the determination of whether defendant has complied with all the terms of this plea agreement rests exclusively with the USAO. Should defendant knowingly give false, misleading, or incomplete information or testimony, the parties agree that: (1) defendant may not withdraw any guilty plea; (2) the USAO is free to make any sentencing recommendation and is not bound by this agreement; (3) statements and information from defendant under this agreement or any previous proffer agreement may be used for any purpose without any restrictions; and (4) defendant may be prosecuted for any crime, whether or not such crime was the subject of this agreement.

    I.    **Defendant's Compliance with the Agreement to Disclose Information**: It is expressly understood and agreed by the parties that the determination of whether defendant has complied with all the terms of this plea agreement rests exclusively with the USAO.

9.    **USAO Sentence Recommendation**: The sentence to be recommended by the USAO in this case is based on the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide a just and fair sentence for this defendant in relation to and in comparison with all of the defendant's co-conspirators.

10.    **Waiver of Appeal/Post-Conviction Relief**: Provided the court imposes a sentence within the range set forth in paragraph 14 below, defendant knowingly and voluntarily

waives the right to appeal from any aspect of the conviction and sentence, unless the sentence imposed exceeds the statutory maximum, the court imposes an upward departure pursuant to Part 5K of the Sentencing Guidelines other than that noted above, or the court exercises its discretion under 18 U.S.C. § 3553(a) to impose a sentence which exceeds the advisory guideline range. Should defendant seek an appeal despite this waiver of that right, the USAO may take any position on any issue on appeal. Defendant also waives the right to file a motion pursuant to 28 U.S.C. § 2255 to set aside the conviction and sentence, except on grounds of ineffective assistance of counsel, newly discovered evidence, or a retroactive change in the applicable guidelines or statute.

11. **Court Not Bound**: The court is not bound by the recommendations of the parties or of the Presentence Report (PSR) writer. Because this agreement is made under Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, defendant may not withdraw any guilty plea or rescind this plea agreement if the court does not follow the agreements or recommendations herein.

12. **Full Disclosure/Reservation of Rights**: The USAO will fully inform the PSR writer and the court of the facts and law related to defendant's case. Except as set forth in this agreement, the parties reserve all other rights to make sentencing recommendations and to respond to motions and arguments by the opposition.

13. **Breach of Plea Agreement**: If defendant breaches the terms of this agreement, or commits any new violations of law between signing this agreement and sentencing, the USAO is relieved of its obligations under this agreement, but defendant may not withdraw any guilty plea.

14. **Substantial Assistance Departure/Variance**: The government acknowledges that defendant provided substantial assistance by voluntarily surrendering to authorities at the Canada-U.S. border, thereby obviating the need for her formal arrest and extradition from Canada. Upon defendant's successful completion of each and every condition of this plea agreement, the government agrees to recommend up to a 12-level downward departure and/or variance pursuant to USSG § 5K1.1 and 18 U.S.C. § 3553(a), with a final sentence not to exceed 90 months. Defendant agrees not to seek a sentence less than 60 months, the statutory minimum for arson offenses under 18 U.S.C. § 844. Defendant is free to request other adjustments, departures or variances to reach the 60-month floor, but the USAO will oppose any such request. Defendant agrees that any grounds upon which she will seek a sentence reduction will be raised sufficiently in advance of the sentencing hearing to give the USAO a full opportunity to respond before the court.

15. **Restitution**: The parties agree that restitution is mandatory, to be paid jointly and severally with co-defendants, in amounts based upon the court's findings and orders in the co-defendant's cases.

Richard J. Troberman
Re: U.S. v. Rebecca Rubin
October 2, 2013
Page 7

---

16. **Total Agreement**: This letter states the full extent of the agreement between the parties. There are no other promises or agreements, either express or implied. If the terms of this offer are acceptable, defendant and counsel should sign below and attach the original of this letter to the Petition to Enter Guilty Plea.

Sincerely,

S. AMANDA MARSHALL
United States Attorney

*/s/ Stephen F. Peifer*
STEPHEN F. PEIFER
Assistant United States Attorney

I have carefully reviewed every part of this agreement with my attorney. I understand and voluntarily agree to its terms. I expressly waive my rights to appeal as outlined in this agreement. I wish to plead guilty because, in fact, I am guilty.

10/10/13                                              */s/ Rebecca Rubin*
Date                                                    REBECCA RUBIN
                                                        Defendant

I represent the defendant as legal counsel. I have carefully reviewed every part of this agreement with defendant. To my knowledge, defendant's decisions to make this agreement and to plead guilty are informed and voluntary ones.

10/10/13                                              */s/ Richard J. Troberman*
DATE                                                    RICHARD J. TROBERMAN
                                                        Attorney for Defendant

ATTACHMENT 1

<u>United States vs. Rebecca Rubin</u> – Factual Basis
Case No. 6:06-CR-60011-AA (D.Ore.)

**Count 1: Conspiracy to Commit Arson:**

Beginning in October 1996 and continuing through December 2005, in the District of Oregon and elsewhere, Rebecca Rubin and other persons, known and unknown, willfully and knowingly conspired and agreed to maliciously damage or destroy, or attempt to damage or destroy, by means of fire, buildings, vehicles and other personal and real property owned in whole or in part or possessed by, or leased to, the United States or any department or agency thereof, and or used in interstate commerce or in any activity affecting interstate commerce.

The conspiracy was accomplished by the defendant and the others when certain of the defendants and others joined together in a group some of them, but not Rubin, called the "Family." This "Family" was what is commonly known as a "cell" of groups and movements publicly named and described by certain of the defendants and others as the Earth Liberation Front (ELF), the Animal Liberation Front (ALF), and other names.

The primary purpose of some of the conspirators was to influence and affect the conduct of government. The primary purpose of other conspirators was to influence and affect commerce, private business and others in the civilian population. To achieve these purposes, some of the conspirators committed and attempted to commit acts potentially dangerous to human life and property that constituted violations of the criminal laws of the United States and of individual states.

Some of the defendants targeted for arson buildings, vehicles and other real and personal property owned, possessed, and leased by the United States and its departments and agencies while others targeted for arson, buildings, vehicles and other real and personal property used in interstate commerce and in activities affecting interstate commerce.

The defendant and others conducted and participated in meetings to plan some of the arsons. Some of the defendants and others conducted research and surveillance of sites targeted for arson and discussed their actions among themselves by using code words, code names, and nicknames. The term "direct action" was used to include arsons and other acts of destruction.

In preparation for the actions, some of the conspirators designed and constructed destructive devices which functioned as incendiary devices to ignite fires and destroy the targets by arson, and provided transportation to the locations of the arson targets.

During the course of the "direct actions" the defendant and others dressed in dark clothing, wore gloves, covered their faces, and otherwise disguised their appearance. Some of the conspirators acted as "lookouts" to ensure secrecy as the crimes were carried out, and some placed destructive devices and accelerants at sites targeted for arson and ignited or attempted to ignite the devices and accelerants.

In some of the arsons and attempted arsons, certain of the defendants and others painted messages on the walls of the targets, including "Earth Liberation Front," "ELF" and related names and statements concerning the purposes of the crimes. However, this was not done in any of the actions in which Rubin participated.

After the arsons and attempted arsons, the defendants and others destroyed, buried, hid and otherwise disposed of physical evidence used in the commission of the crimes. Thereafter, some of the conspirators publicized and promoted the results of the fires by means of written press releases and communiques which attributed the arsons to the Earth Liberation Front (ELF), the Animal Liberation Front (ALF) and related groups, and stated the purpose of the arsons.

Before, during and after the arsons and attempted arsons, some of the defendants and others agreed among themselves never to reveal to law enforcement authorities or to anyone else outside the cell the identity of the conspirators and participants in the arsons and attempted arsons and agreed among themselves to conceal or destroy any evidence connecting them to the arsons and attempted arsons. Some of the defendants and others possessed and/or used false identification documents in order to conceal their true identities and to facilitate travel, and after the arsons and attempted arsons, some of the defendants and others fled and secreted themselves in foreign countries in order to avoid detection and arrest by law enforcement authorities in the United States.

**Count 7: Arson — BLM Wild Horse Facility, Burns, Oregon**

Prior to November 30, 1997, some of the defendants, but not Rubin, traveled to the Bureau of Land Management of the Department of the Interior, Wild Horse and Burro Facility, Burns, Harney County, in the District of Oregon to perform a reconnaissance of that facility. They discussed plans for releasing the horses from the corrals and setting fire to the facilities. Immediately prior to November 30, 1997, Rubin and others were driven to a gate at the front of the facility. Rubin and the others were dropped off at that location while the driver remained with the vehicle and served as a lookout. The defendants had two-way radios with which to maintain contact with each other. The lookout also had a police scanner to monitor police dispatcher radio traffic so that he and the others could avoid being detected by law enforcement. Rubin and others released the horses from the corrals while others placed the incendiary devices at the facility. When the lookout received word over his two-way radio that the horses had been released and the incendiary devices had been set, he returned to the front gate, picked up the others and they all traveled back to Eugene, Oregon. The incendiary devices functioned and destroyed the facility. The buildings and other real and personal property were used in interstate commerce and in activities affecting interstate commerce and were owned and possessed by the United States and the Bureau of Land Management of the Department of the Interior.

**Count 8: Attempted Arson — U.S. Forest Industries**

Several weeks prior to December 22, 1998, some of the defendants, but not Rubin, performed a reconnaissance and a "dry run" of the U.S. Forest Industries facilities at 2611 Whittle Avenue, Medford, Jackson County, in the District of Oregon, in preparation for an arson

at that location. On December 22, 1998, Rubin, Jacob Ferguson, and others were driven to U.S. Forest Industries and dropped off. One of the defendants remained in the van and served as a lookout from a distance while Rubin helped carry equipment, and also acted as a lookout. Ferguson then placed time-delayed incendiary devices about the facility. They then all drove back to Eugene, Oregon. The devices failed to function. The buildings and other real and personal property were used in interstate commerce and in activities affecting interstate commerce. The property was destroyed a few days later in an arson in which Rubin had no part.

**Case No. 06-CR-00191-REB (D.Colo.)**

**Counts 1 through 8: Arson of the Vail Ski Area, Eagle County, Colorado**

In the fall of 1998, Rubin and others traveled to Vail in Eagle County, Colorado where they performed reconnaissance for a possible arson at the Vail Mountain Ski Resort using digital timers and incendiary devices. The plan was motivated by environmental and animal welfare concerns. Rubin and others carried fuel up the mountain, where it was hidden in the snow for later use. When it was later determined that because of the cold temperatures and altitude the digital timers were too unreliable to use, and because of other significant logistical problems, the arson plan was aborted, and all of the defendants left Colorado for Wyoming. Later, two individuals returned to Colorado and the arson was completed by placing the fuel containers at the various structures named in the indictment, lighting the fuel by hand, and thereby causing fires that destroyed each structure. Each structure was used in interstate commerce and in activities affecting interstate commerce. Rubin was not one of the individuals who returned to Colorado, and she did not participate in the actual arsons.

**Case No. 2:06-CR-0155-DFL (E. Dist. of Calif.)**

**Arson – BLM Wild Horse Facility, Litchfield, California**

In the late summer of 2001, some defendants performed reconnaissance at the Bureau of Land Management's Wild Horse Corrals near Litchfield, California. They wanted to target the facility to prevent the government taking wild horses off public lands and sending them to slaughterhouses. Rebecca Rubin was recruited to come from Canada to participate in the horse release and arson. Rubin was picked up near the border on the U.S. side and was taken to a Seattle residence. On October 14, 2001, Rubin and other conspirators arrived at the BLM site and camped nearby where the action was planned in detail. Another defendant had already constructed the incendiary devices. On a mound overlooking the site, some of the participants tested a night-vision scope for use in the crime. The next night, October 15, 2001, Rubin and the other participants dressed in black clothing and wore disposable shoes and gloves. While others placed fuel and incendiary devices, Rubin assisted in the release of the horses. Only one device ignited, destroying a barn and its contents. The building and other real and personal property were used in interstate commerce and in activities affecting interstate commerce, and were owned and possessed by the Bureau of Land Management of the U.S. Department of the Interior.